UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CASSANDRA WELCH, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-0641-RLY-JMS |
| | ) | |
| ELI LILLY & COMPANY, | ) | |
| Defendant. | ) | |

## ENTRY ON PENDING MOTIONS

This matter is before the magistrate judge on Plaintiffs' Second Motion to Compel

Discovery (Dkt. # 163); Defendant's Motion to Strike Dr. Lance Seberhagen's Untimely Expert

Opinions and Report (Dkt. # 245); Plaintiffs' Motion to Compel Documents Improperly

Withheld on the Basis of Privilege (Dkt. # 166); and Plaintiffs' Motion to Compel Discovery

Into Defendant's Reallocation and Buyout Processes (Dkt. # 170).  The motions are fully briefed,

and have been supplemented because of additional discovery.  In addition, on January 14, 2009,

a hearing was held on the motions to compel.  Being duly advised, the magistrate judge rules as

follows.

## Procedural History

A procedural chronology bears mentioning at the outset.  On May 29, 2007,  the Court

approved the original Case Management Plan (CMP), in which the parties agreed to a staging of

the litigation that provided for class certification related discovery and expert disclosures prior to

the deadline for Plaintiffs' motion for class certification.  (Dkt. 41).  The CMP further

contemplated that following ruling on the class certification motion, an updated CMP would be

prepared.   The original deadline for Plaintiff's Fed. R. Civ. P. 26(a)(2)(B) expert  disclosures

was September 20, 2007.  By agreement, on September 4, 2007 the Court allowed the Plaintiff's expert deadline to be extended to November 19, 2007.  (Dkt. 46).  On the day the report was due, Plaintiffs moved to continue or modify the case management plan.  (Dkt. 53).  In support of the motion to continue, Plaintiffs's counsel noted an "unusually heavy workload" and advised that he had "made arrangements with other counsel" to join the case.  (Dkt. 60-3, ¶6).  On January 17, 2008, the Court granted Plaintiff's motion, in part, and extended the certification related expert disclosure deadline until September 12, 2008.  (Dkt. 78).  The following week, Defendant produced personnel data regarding all white and African-American employees who, at any of six specific points in time, were in the same pay scale group and who reported directly or indirectly to each named Plaintiffs' first, second or third level supervisor.  The production encompassed over 4000 employees.

The discovery wars then began.  Plaintiff moved to compel companywide personnel data for the first time on February 1, 2008.  (Dkt. 86).  The motion was fully briefed as of March 27, 2008 and on April 16, 2008, the motion was denied.  (Dkt. 133).  The Court found Plaintiff had not made a sufficient showing to justify production of company wide discovery.  The Court did, however, suggest a future course of conduct for Plaintiffs:

> The Court also notes that Lilly's papers repeatedly scold Plaintiffs for not producing any evidence from the information already provided by Lilly to support their claim of a discriminatory pattern or practice.  The Court is unaware whether Plaintiffs have had the opportunity to cull that data to locate supporting evidence.  It would seem to be a reasonable next step.

(Dkt. 133, pg. 5).  Despite this cue, and with expert disclosures due in less than 90 days, it was not until June 20, 2008 when  Plaintiff's counsel first made contact with Dr. Seberhagen.  After a last-minute four-day extension by agreement, the original Seberhagen report was submitted on September 16, 2008.  On September 12, 2008, Plaintiffs sought clarification of the CMP in an effort to preserve their right to supplement expert reports should additional discovery be permitted.  (Dkt. 138).  That motion was denied as premature.  (Dkt. 151).  The various motions at issue  were thereafter filed, but only after a deadline for their filing was imposed by the Court. (Dkt. 151).  The motions were filed on the deadline, November 6, 2008.

**Discussion**

Plaintiffs' Second Motion to Compel seeks an order requiring Defendant Eli Lilly & Company ("Defendant") to produce personnel data for the entire company for a period of over five years.  This Court previously denied Plaintiffs' First Motion to Compel Discovery of this same information on the basis that Plaintiffs "have not satisfied this Court that the scope of discovery should be expanded to include the 21,000 person national workforce of [Defendant]." (Dkt.  113 pgs. 4-5).  Plaintiffs now claim to have sufficient evidence to convince the Court that the scope of discovery should be so expanded.  In support, they primarily rely upon the expert report of Dr. Lance Seberhagen.  A second expert report upon which Plaintiffs initially relied has been withdrawn from consideration.[1]

---

[1]As with its criticisms of the Seberhagen report, discussed *infra*, Defendant launched a scathing attack on the now withdrawn expert report of Dr. Anderson.  Defendant accused Plaintiffs' counsel of essentially ghost-writing the Anderson report, and even going so far as to make substantive changes to Anderson's conclusions.  (Dkt. 228, pg. 8-10), (Exh. ZZZ).  While the Anderson report has since been withdrawn, the exhibits concerning the report, and their revelations about Plaintiffs' counsel's conduct,  do serve to inform the Court's decision.

At the January 14, 2009 hearing, at which time the motion was fully briefed, Defendant informed the Court that it had conducted a deposition of Dr. Seberhagen, and the other expert's deposition was scheduled in the coming days.  The Court therefore permitted a supplemental response to be filed by Defendant, and a supplemental reply by Plaintiffs.  However, Plaintiffs' submitted not only a supplemental reply, but also a "supplemental" report from Dr. Seberhagen.

Plaintiffs assert that Dr. Seberhagen's analyses in his original report show that there is a causal nexus between the subjective decision making allowed under Defendant's Performance Management process described in the Second Amended Complaint and the patterns of discrimination in ratings, promotions, terminations and pay raises, therefore making a prima facie case to allow company-wide discovery.  They claim his results "show that Defendant's overall promotion and retention policies have an adverse impact on the limited set of African-American employees in the partial data set produced to date."  (Dkt. #164 pg. 18-19).  Dr. Seberhagen also opined "that the elements of Defendant's Performance Management process are not likely to be capable of separation for analysis."  (Dkt. # 164 pg. 14).

Defendant responds that Dr. Seberhagen's adverse impact analysis is deficient in that it shows results from all of Defendant's employment practices collectively, and such "broad statistical imbalances cannot state, much less support, any disparate impact action under Title VII."  (Dkt. # 182 pg. 12).  This argument is also one of the grounds raised by  Defendant in support of its motion to dismiss Plaintiffs' disparate impact claims in their Second Amended Complaint.

After conducting expert discovery, including a deposition of Dr. Seberhagen, Defendant leveled numerous criticisms of his report in its supplemental response.  Defendant asserts his

statistics are fatally flawed in that he admitted he could have separated Defendant's various employment practices for analysis but did not because Plaintiffs' counsel did not ask him to do so.  Thus, Defendant contends, limitations on his analysis were not due to the lack of information or the absence of company-wide discovery, but rather resulted from limits imposed by Plaintiffs' counsel.  Further, while Dr. Seberhagen stated that counsel did not ask him to establish a causal link between performance ratings and any differences in salary or promotion, he admitted that he could have done a regression analysis to determine if such a link existed.  Defendant also emphasizes Dr. Seberhagen's failure to control for any obvious explanations for differences in promotion rates, and pay and termination rates, such as qualifications, differences in discipline, tenure, position, level, career ladder, and resignations.  Finally, Defendant takes serious issue with critical language in the report that it contends was not written by Dr. Seberhagen, but instead by Plaintiffs' counsel.

In response to these criticisms, Plaintiffs tendered a supplemental report from Dr. Seberhagen with their supplemental reply.  Plaintiffs state that "Dr. Seberhagen has conducted several supplemental analyses to address criticisms raised by defense counsel." (Dkt. # 239 pg. 3).  One of those supplemental analyses is a regression analysis.

It is this supplemental Seberhagen report that Defendant has moved to strike.  Resolution of the motion to strike affects what data the Court will consider in determining whether to grant or deny Plaintiffs' Second Motion to Compel.  Therefore, the Court first addresses the Defendant's Motion to Strike Dr. Lance Saberhagen's Untimely Expert Opinions and Report.

**<u>Motion to Strike</u>**

Defendant contends the supplemental expert report is a new report and opinion, and as such, when Plaintiffs filed it, they violated both the Court's order on supplemental briefing and the expert report deadline.  Consequently, Defendants argue that Plaintiffs are required to show excusable neglect for violating these deadlines.

Plaintiffs counter that the supplemental report is simply a preemptive rebuttal of Defendant's criticisms of the original report and, as a supplemental disclosure, is timely pursuant to Federal Rule of Civil Procedure 26(e)(2) ("Rule 26(e)(2)").  They also claim that if the supplemental report is considered a rebuttal, it is timely under Rule 26(a)(2)(C)(ii).  Plaintiffs further argue that even if the supplemental report is considered new, its disclosure is substantially justified and is harmless, as both the original report and supplemental report "are offered only for the purpose of obtaining the discovery necessary to prepare expert reports for class certification." (Dkt. # 251 pg. 2).

The Court must first examine whether the supplemental report is truly supplemental, a rebuttal report, or an entirely new report.  The answer is actually provided by Plaintiffs themselves.  They state in their supplemental reply that there are "new reasons" to allow "normal discovery," citing the "supplemental analyses" conducted by Dr. Seberhagen.  (Dkt. # 239 pg. 3).  The fact that entirely new analyses were conducted demonstrates the report cannot be characterized as simply a supplemental or a rebuttal report.

Indeed, Rule 26(a)(2)(B) requires an expert's written report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the data or other information considered by the witness in forming them."  Fed. R. Civ. P.

26(a)(2)(B)(i)-(ii).  Therefore, the analyses and opinions in the supplemental report should have been contained in the original report due September 16, 2008.  The need for such report could not have been lost on Plaintiffs.  In order make a prima facie case on their disparate impact claim,

> [t]he plaintiff must first "isolate and identify 'the specific employment practices that are allegedly responsible for any observed statistical disparities'", and second demonstrate causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in protected group."
> *Bennett v. Roberts,* 295 F.3d 687, 698 (7th Cir.2002) (citations omitted); *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 513 (7th Cir.1996).

*Farrell v. Butler Univ.,* 421 F.3d 609, 616 (7th Cir. 2005).

Plaintiffs' claim that Dr. Seberhagen's new report is merely a supplement rings hollow. Rule 26(e) provides that a party must supplement or correct a disclosure or response "if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).  "It does not give the producing party a license to disregard discovery deadlines and to offer new opinions under the guise of the supplement label."  *Allgood v. Gen. Motors Corp.*, No. 1:02-cv-1077-DFH-TAB, 2007 U.S. Dist. LEXIS 8123, at *10 (S.D. Ind. Feb. 2, 2007) (citing *Solaia Tech. LLC v. Arvin Meritor, Inc.*, 361 F. Supp. 2d 797, 806 (N.D. Ill. 2005) (citing *Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003) (striking late-filed report styled as a "supplemental opinion")).  *See also Metro Ford Truck Sales, Inc. v. Ford Motor. Co.*, 145 F.3d 320, 324 (5th Cir. 1998) (affirming exclusion of late report presented as "supplement": "The

purpose of supplementary disclosures is just that -- to supplement.  Such disclosures are not

intended to provide an extension of the expert designation and report production deadline.");

*Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001) (stating that

Rule 26(e) imposes duty on producing party; it does not give that party a right to rely on

supplements to produce information required by earlier deadline); *Keener v. United States*, 181

F.R.D. 639, 640-41 (D. Mont. 1998) (excluding defendant's late attempt to present "supplement"

with the substantive opinions in the case); *Gilbane Bldg. Co. v. Downers Grove Cmty. High Sch.*,

No. 02 C 2260, 2005 U.S. Dist. LEXIS 43231, 2005 WL 838679, at *9 (N.D. Ill. Apr. 5, 2005)

(rejecting attempt to "supplement" with an entirely new subject and analysis).

      Treating Dr. Seberhagen's new report as merely a supplemental report would, as

Defendant points out, cause further delay, because Defendant would certainly have the right to

conduct discovery on these new analyses.  Certainly, to find that Dr. Seberhagen's new report

containing brand new analyses was nothing more than a supplement

> would create a system where preliminary reports could be followed by
>
> supplementary reports and there would be no finality to expert reports, as each
>
> side, in order to buttress its case or position, could supplement existing reports
>
> and modify opinions previously given.  This practice would circumvent the full
>
> disclosure requirement implicit in Rule 26 and would interfere with the Court's
>
> ability to set case management deadlines, because new reports and opinions
>
> would warrant further consultation with one's own expert and virtually require
>
> new rounds of depositions.

*Beller v. United States,* 221 F.R.D. 689, 695 (D.N.M. 2003) (striking supplemental report with opinions broader and deeper than and different from those provided in original timely report) (quotation and citation omitted).  The original expert deadline was the time for Plaintiffs to have provided a complete statistical analysis based on the data they had.  The Court cannot countenance the circuitous process invoked by Plaintiffs with their supplement.

As for Plaintiffs rebuttal claim, Rule 26(a)(2)(C)(ii) states that expert disclosures must be made within thirty days after the other party's disclosure "if the evidence is intended solely to contradict or rebut evidence *on the same subject matter* identified by" Defendant. (emphasis added). Fed. R. Civ. P. 26(a)(2)(C)(ii).  As Defendant points out, it had not even tendered its expert reports when Plaintiffs filed Dr. Seberhagen's supplemental report.  Thus, it cannot fairly be characterized as a rebuttal report.  Perhaps anticipating such an argument, Plaintiffs characterize the supplemental report as a pre-emptive response to Defendant's anticipated expert report.  However, a rebuttal report is one that contradicts or rebuts the arguments or opinions of the opposing party's experts, not one that contains entirely new analyses.  Plaintiffs have no idea what arguments or opinions Defendant's experts intend to make and cannot possibly rebut that which does not yet even exist, even preemptively.  For all of the foregoing reasons, the Court finds Dr. Seberhagen's "supplemental report" to be, in fact, a brand new expert report.

The Court must now address Defendant's arguments that said report must be stricken as untimely.  Defendant first argues the report exceeds the leave the Court granted for supplemental briefing.  This is certainly true.  The Court in no way contemplated new reports as part of the supplemental briefing, and no leave of the Court was sought to authorize the new report.

Defendant next asserts that the new report violates the expert report deadlines imposed by the case management plan.  That deadline was September 12, 2008, extended due to clerical issues upon motion by Plaintiffs to September 16, 2008.  Because that deadline has long passed, Defendant contends that Plaintiffs are required to show they were unable to meet that deadline as a result of excusable neglect.  Fed. R. Civ. P. 6(b).

Plaintiffs assert excusable neglect is the incorrect legal standard, and in fact, the untimeliness of the report is subject to Rule 37(c)'s exclusion standard whereby Plaintiffs have to show their failure was substantially justified or is harmless.  Plaintiffs claim Dr. Seberhagen's new report is justified, as the purpose was to address Defendant's critiques of his original report.  Further, they assert his new report contains no new opinions, and simply reaffirms his original opinion.  Plaintiffs also argue Defendant has failed to show it will be harmed in any way by admission of the new report.

Regardless of whether the standard is substantially justified or excusable neglect, it is Plaintiff's burden to show it, and they have failed to do so.  First, Dr. Seberhagen's new report does not simply affirm his original opinion and report; it is an attempt to bolster it with new analyses not previously performed on the exact same data.  Plaintiffs provide no specific explanation as to why those analyses were not performed as part of the original report given that the data was available.  They point out that the original report "specifically notes that the redacted data set is not adequate to provide a company wide analysis and includes regression analyses among items for further study." (Dkt. # 251 pg. 3).  However, the regression analyses contained in the new report were in fact performed on the exact same data that was available for the original report.  Seberhagen admitted he could have performed them from the start, but

plaintiffs' counsel chose not to request them.  Indeed, the Court suggested such analysis would be a "reasonable next step" in its entry denying the First Motion to Compel.

Second, the Court notes that Plaintiffs first contacted Dr. Seberhagen on June 20, 2008, more than two months after the Court's entry denying Plaintiffs' First Motion to Compel.  (Dkt. # 226 Ex. TT).[2]  Plaintiffs were well aware of the expert deadline of September 12, 2008, yet delayed two months in even retaining an expert for the purpose of supporting their claim for company-wide discovery.

The only explanation Plaintiffs provide as to why the analyses in the new report were not done as part of the original is that counsel for Plaintiffs was "stretched for money and manpower."  (Dkt. # 251 pg. 3).  Counsel's inability to devote sufficient time and resources to this matter is not substantial justification or excusable neglect for the untimely report.  Counsel had represented to the Court in November of 2007 that additional counsel were being added.  (Dkt. 60-3).  Counsel's claim is even more confounding given that this matter was filed as a putative class action, and counsel represented in the original Complaint that Plaintiffs "have retained qualified counsel.  Their legal representative, Rose & Rose, P.C., will adequately represent the class."  (Complt. ¶ 27).  Counsel's proffered justification for the belated report certainly contradicts this representation.  If counsel had neither the time nor the resources to prosecute a large class action against a national company the size of Defendant, then he should not have represented otherwise to the Court in Plaintiffs' Complaint.

---

[2]All of Defendant's exhibits are labeled alphabetically and can be found in Dkt. #'s 184, 187 and 226.  Going forward, Defendant's exhibits will be referred to only by the letter designation, without a corresponding docket number.

Counsel's claim of insufficient resources is further undermined by the fact that the supplemental report was obtained within 15 days following the hearing on instant motions.  Over eight months passed between the time of Lilly's production of the subset of personnel data to the September expert deadline.   The report was produced within 15 days on the very same data.[3] No justifiable reason whatsoever has been offered as to why it was not done immediately following the initial production, immediately following the Court's suggestion in April, or immediately following the retention of Dr. Seberhagen in June.  The correspondence between Plaintiffs' counsel and Seberhagen suggest that, rather than lack of resources, some desired strategic advantage resulted in the limits placed on the original report.

Presently, several other firms and attorneys have entered appearances.  So it is true there are new resources.  However, the cavalry has come too late on this issue.  There is simply no justification or excuse for the untimely creation of Dr. Seberhagen's new report.  And contrary to Plaintiffs' assertion, Defendant would be harmed were the Court to consider it.  As described above, Defendant has had no opportunity to conduct discovery regarding the new report or make argument regarding why it does not support Plaintiffs' motion to compel.

"Once a party invokes the judicial system by filing a lawsuit, it must abide by the rules of the court; a party can not decide for itself when it feels like pressing its action and when it feels like taking a break because trial judges have a responsibility to litigants to keep their court calendars as current as humanly possible."  *James v. McDonald's Corp.,* 417 F.3d 672, 681 (7th Cir. 2005), citing *GCIU Employer Ret. Fund v. Chicago Tribune Co.,* 8 F.3d 1195, 1198-99 (7th

---

[3]Because the data on which Dr. Seberhagen's supplemental report is based has been in Plaintiffs' possession since January 2008, Plaintiffs cannot rely on their attempt to preserve a right to supplement based on further discovery. (*See* Dkt. 138).

Cir. 1993)(internal quotations omitted).  "Courts cannot operate without setting and enforcing

deadlines."  *Gross v. Town of Cicero*, 528 F.3d 498, 499-500 (7th Cir. 2008).  "The law is full of

deadlines, and delay can lead to forfeiture."  *Id.* at 500.  Dr. Seberhagen's supplemental report

was filed in violation of the deadline on pre-certification expert disclosures, and the violation is

not substantially justified or the result of excusable neglect. Defendant's motion to strike is

**GRANTED.**  Dr. Seberhagen's new report will not be considered by the Court.

### Second Motion to Compel

Plaintiffs seek what they label as "normal discovery," or discovery regarding all of

Defendant's employees company-wide.  Plaintiffs sought the same discovery with their First

Motion to Compel, and the Court determined that "Plaintiffs have not satisfied this Court that the

scope of discovery should be expanded to include the 21,000 person national workforce of

Lilly." (Dkt. # 113 pgs. 4-5).  In making its decision, the Court stated the following:

> Managing discovery in class actions is not an easy task.  "District courts
> are required to balance the need to promote effective case management, the need
> to prevent potential abuse, and the need to protect the rights of all parties." *Tracy
> v. Dean Witter Reynolds, Inc.,* 185 F.R.D. 303, 305 (D. Colo. 1998), citing
> *Shushan v. University of Colorado,* 132 F.R.D. 263, 268 (D. Colo. 1990).  While
> some pre-certification discovery is often necessary, limitations may be imposed
> by the Court and are within its sound discretion.  *Id.*; see also *Barnhart v. Safeway
> Stores, Inc.,* 1992 U.S. Dist. LEXIS 22572 at *4-5 (E.D. Ca. 1992), 60 Fair.
> Empl. Prac. Cas. 751.

Pre-certification discovery that is permitted "should be sufficiently broad that the plaintiffs have a fair and realistic opportunity to obtain evidence which will meet the requirements of Rule 23, yet not so broad that the discovery efforts present an undue burden to the defendant." *Tracy,* 185 F.R.D. at 305, citing *National Organization for Women v. Sperry Rand Corp.,* 88 F.R.D. 272, 277 (D. Conn. 1980). The Court finds this standard, and *Tracy*, to be particularly helpful in deciding the instant motion.

To that end, the Plaintiffs "bear the burden of advancing a prima facie showing that the class action requirements of Fed. R. Civ. P. 23 are satisfied, or that discovery is likely to produce substantiation of the class allegations." *Mantolete v. Bolger,* 767 F.2d 1416, 1424 (9th Cir. 1985); *Tracy,* 185 F.R.D. at 305. Based on the record submitted to date, the Plaintiffs have not met that burden.

(Dkt. # 113, pgs. 3-4).

Plaintiffs submit that based upon Dr. Seberhagen's original report, they have now made the prima facie showing necessary to permit company-wide discovery.

In applying the above standards to its decision here, the Court is also mindful of the pending Motion to Dismiss filed by Defendant in which it argues generally that Plaintiffs' disparate impact claims should be dismissed. Defendant challenges those claims on a failure to exhaust theory, and also on the basis that the claims are not supported by factual allegations sufficient to show they are entitled to relief. Indeed, a motion to dismiss Plaintiffs' disparate impact claims in their original Complaint, as well as the individual claims of thirty-one

14

Plaintiffs, was granted by Judge Young after this Court's ruling on Plaintiffs' First Motion to Compel Discovery.

The pending Motion to Dismiss is all the more relevant given the United States Supreme Court's discussion and decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007). In that case, the Supreme Court emphasized that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 1964-65 (quotations and citations omitted). Such requirements are necessary because of the high costs of discovery in many cases. *Id.* at 1966-67 (stating that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court") (internal quotations and citations omitted)). The Court considers the company-wide discovery sought by Plaintiffs to be precisely the type of discovery that the Supreme Court contemplated as both costly and time consuming. (*See* Ex. PP).

Defendant argues that Dr. Seberhagen's report does not establish a prima facie case for company-wide discovery, noting many flaws in his report. Defendant points out the analyses and conclusions in the report appear to be more counsel-driven than expert-driven. Defendant also notes that Plaintiffs have repeatedly claimed that Defendant's failure to provide complete, company-wide data has prevented Dr. Seberhagen from conducting complete analyses. (*See* Dkt. # 164 pgs. 12, 17, Dkt. # 210 pg. 2, Hr'g Tr. at 13:22-24, 14:1-9; Seberhagen Report, Ex.

HH).  Yet, discovery revealed that it was plaintiff's counsel's direction to Dr. Seberhagen, not lack of data, that limited the analyses he conducted.

Discovery related to the expert disclosures established that counsel for Plaintiffs provided a summary of allegations and facts to Dr. Seberhagen.  The summary included statistics provided by counsel, and counsel's characterization that the data "indicate white employees tend to be promoted and tend to become managers at rates significantly above those of their African American co-workers."  (Ex. FFF).  These are opinions ultimately expressed by Dr. Seberhagen as well.  Counsel also provided Dr. Seberhagen with two cases illustrating "how courts are looking at evidence of subjective performance management systems and the facts necessary to prove the case."  (Exs. III & JJJ).  Counsel told Dr. Seberhagen "the caselaw should inform your presentation of the facts."  (Ex. III).

The day the expert report was due, counsel for Plaintiffs instructed Dr. Seberhagen to "include some language in your conclusions section using a phrase like 'causal connection' between the adverse impact observed in the numbers and the Performance Management process" because "causal connection is the key phrase in the most recent opinions."  (Ex. MMM).  These examples demonstrate that the independence of Dr. Seberhagen's analyses and report is highly questionable.

As noted above, Plaintiffs have repeatedly claimed they are unable to conduct complete analyses without company-wide data.  However, the deposition of Dr. Seberhagen revealed that there were many analyses he could have conducted but did not, simply because he was not asked to do so by counsel.  (*See* summary of Dr. Seberhagen's deposition testimony detailing things he could have done but did not do, Dkt. # 228 pgs. 11-13.).  Furthermore, in his "Notes on Lilly,"

discussing the statistical data produced by Defendant in discovery, even Plaintiffs' counsel opines that while the "data set is not a scientifically representative sample of the U.S. workforce. . . there is no reason to assume that the promotion, termination and rating trends found in this group are any different from what an analysis of the entire workforce would show."  This statement, as well as the expert's admitted failure to conduct analyses that could have been performed based on the current data, undermines Plaintiffs' position that company-wide discovery is even necessary.

Defendant further argues that Dr. Seberhagen's disparate impact statistics are fatally flawed because he admits he could have separated various employment practices of Defendant for analysis but did not.  (Ex. WW, 88:1-22; 104:13-107:12).  Seberhagen's admissions create a problem for Plaintiffs, as they contradict prior positions taken by Plaintiffs in the case.  Plaintiffs have alleged that the various aspects of Defendant's Performance Management system are incapable of being separated for analysis.  (*See* Dkt. # 172, Pls.' Resp. to Mot. to Dismiss; Dkt. # 131 ¶ 50, Pls.' Second Am. Complt.).

Defendant further challenge Dr. Seberhagen's analyses because he failed to control for differences in qualifications for promotion, differences in discipline, tenure, career ladder or any other factors that might explain the purported disparities he found.  Further, when examining promotions, he failed to account for differences in qualifications for promotions, including basic eligibility requirements.  Lastly, when examining terminations, Dr. Seberhagen failed to control for resignations.

As Plaintiffs correctly note, the "failure to include variables will affect the analysis' probativeness, not its admissibility."  *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 423 (7th

17

Cir. 2000).  The probative value of Dr. Seberhagen's report is already questionable due to the

flaws previously described.  The failure to account for certain variables, particularly resignations

when examining terminations, and qualifications for promotion, further decreases the probative

value of his report.  *See generally EEOC v. Chi. Miniature Lamp Works*, 947 F.2d 292, 301-02

(7th Cir. 1991); *Murphy v. PricewaterhouseCoopers, LLP.,* 580 F. Supp. 2d 16, 30 (D.D.C.

2008).

      The Court notes that Federal Rule of Evidence 702 permits expert testimony when it will

assist the trier of fact, and when the testimony is the product of reliable principles and methods.

The Court is required to perform a gatekeeping function to determine whether an expert's report

should be admitted.  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993).  *Daubert* provides a set of criteria that the Court should consider

in determining the reliability of an expert report.  The 2000 Advisory Committee Notes to FRE

702 also provide pertinent guidance.  *Fuesting v. Zimmer, Inc*., 421 F.3d 528, 534 (7th Cir.2005).

      The correspondence between Plaintiffs' counsel and Seberhagen establishes evidence of

spoonfeeding of both specific language and conclusions to Seberhagen by Plaintiffs' counsel that

is both troubling and substantial.  Similar conduct was demonstrated with the now withdrawn

Anderson report.  As has been discussed at length, Plaintiffs' counsel also placed limits on

Seberhagen's analysis.   This unacceptable behavior and the report it produced run afoul of

several of the Advisory Committee's reliability criteria:

      (6) whether the testimony relates to "matters growing naturally and directly out of

      research they have conducted independent of the litigation," or developed

      "*expressly for purposes of testifying";* (7) "[w]hether the expert has unjustifiably

18

extrapolated from an accepted premise to an unfounded conclusion"; (8)

"[w]hether the expert has adequately accounted for obvious alternative

explanations"; [and] (9) *"[w]hether the expert is being as careful as he would be*

*in his regular professional work outside his paid litigation consulting"*

*Fuesting v. Zimmer, Inc*. 421 F.3d 528, 534 -535 (7th Cir. 2005)(emphasis supplied) (citation

omitted). To be blunt, in preparing his original report, Seberhagen served more as a hired

mouthpiece than as an independent expert seeking to assist the Court. The report is not worthy of

credit.[4]

The Court therefore remains unpersuaded that Plaintiffs have shown that company-wide

discovery is justified. Furthermore, although Defendant has not quantified the burden of

producing company-wide data in terms of time and money, it has shown that to compile the data

Plaintiffs seek would require significant work. Moreover, the sheer number of employees of

Defendant alone quantifies the burden in the Court's view. Accordingly, the Court finds that the

proposed discovery would subject Defendant to an undue burden and must, therefore, be denied.

*See Tracy*, 185 F.R.D. at 305.

For all of the foregoing reasons, Plaintiffs' Second Motion to Compel is **DENIED.**

**Motion to Compel Documents Improperly Withheld on the Basis of Privilege**

---

[4]In making its findings with respect to the original Seberhagen report, the Magistrate
Judge does not purport to rule on the propriety of the report for any purpose other than ruling on
the instant motion.

Plaintiffs move for an order compelling Defendant to produce the following: (1) all records associated with Office of Federal Contract Compliance ("OFCCP")[5] audits and investigations of Eli Lilly & Company from 2002 to the present that involved issues of racial patterns in promotion and distribution of employees through job progressions, company units and selection processes for transfers, ratings, raises and promotions; (2) the "feeder data" Defendant extracts from its SAP database and then analyzes for purposes of its affirmative action and related Equal Employment Opportunity ("EEO") programs -- including all data provided to agents of Defendant retained to conduct the analyses required by OFCCP Executive Order 11246[6] and implementing regulations, as well as data analyzed internally in connection with race-based adverse impact and diversity analyses; and (3) all affirmative action analyses from 2002 to the present Defendant has conducted, either internally or pursuant to 41 C.F.R. § 60-2.17(b).[7]

Defendant asserts it has already provided extensive non-privileged information about its affirmative action planning processes and compliance. It has produced affirmative action plans, EEO-1 reports, the results of four OFCCP closed audits, and produced several Rule 30(b)(6)

---

[5]The OFCCP is responsible for ensuring that employers doing business with the federal government (such as Defendant) comply with the laws and regulations requiring nondiscrimination and affirmative action in employment. In carrying out its responsibilities, the OFCCP conducts compliance evaluations and complaint investigations of federal contractors' and subcontractors' personnel policies and procedures. *See* www.dol.gov/esa/ofccp/index.htm.

[6]Requires contractors to file compliance reports. http://www.dol.gov/esa/ofccp/regs/statutes/eo11246.htm (last visited Mar. 2, 2009).

[7]OFCCP regulation requiring government contractors to perform in-depth analyses of its employment process to determine whether and where impediments to equal employment opportunity exist. 41 C.F.R. § 60-2.17(b).

witnesses to discuss non-privileged topics.  Defendant objects to producing any further documents as sought by Plaintiffs in this motion on the basis of lack of relevance, duplication, burden and attorney-client privilege.

Defendant asserts that the documents sought are not relevant because they encompass company-wide data, which the Court has heretofore prohibited, and also cites its pending Motion to Dismiss Plaintiffs' disparate impact claims.  Plaintiffs' request for all "feeder data" does appear to be a secondary attempt to obtain company-wide personnel data, and the Court has already found that such discovery may not be had.  Otherwise, however, it cannot seriously be disputed that affirmative action analyses would be relevant to claims of employment discrimination on the basis of race.  Defendant's relevance objection is overruled.  The real question here, in the Court's view, is whether the documents sought are indeed protected by the attorney-client privilege.

Defendant claims that all affirmative action analyses and analyses related to OFCCP compliance are conducted at the direction and on the advice of internal and external counsel.  In that regard, Steve Hervey, a member of Defendant's EEO/Affirmative Action group, testified repeatedly at his deposition that these analyses were conducted "as part of a privileged and confidential analysis that is done at the request of counsel."  (Ex. Z).  Further, Defendant states it does not provide these analyses to the OFCCP, but provides only the EEO-1 report.  Indeed, EEO-1 reports are required to be filed annually.[8]  All EEO-1 reports have been provided to Plaintiffs.

---

[8]See http://www.dol.gov/esa/ofccp/regs/compliance/faqs/emprfaqs.htm. (last visited March 2, 2009).

The attorney-client privilege protects communications between a client and his lawyer. "The privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).

The Seventh Circuit applies the general principles of attorney-client privilege as outlined by Professor Wigmore:

> (1) Where legal advice of any kind is sought, (2) from a professional legal adviser in a capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at the client's instance permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection is waived.

*United States v. White*, 950 F.2d 426, 430 (7th Cir.1991) (quoting *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (citing 8 Wigmore § 2292)). Because Defendant is the party seeking to establish the privilege, Defendant bears the burden of demonstrating that all of the requirements for invoking the attorney-client privilege are met. *Id.* at 430. The inquiry into whether documents are subject to the privilege "'must be made and sustained on a question-by-question or document-by-document basis . . . .' [I]t cannot be a blanket claim." *E.E.O.C. v. Int'l Profit Assoc.*, 206 F.R.D. 215, 218 (N.D. Ill. 2002) (quoting *White*, 950 F.2d at 430).

The attorney-client privilege extends to corporate in-house counsel. *See Upjohn*, 449 U.S. at 389. However, communications made by and to a corporate in-house counsel with respect to business matters, management decisions, or business advice are not protected by the

22

privilege.  *See Rehling v. City of Chicago,* 207 F.3d 1009, 1019 (7th Cir. 2000); 6 Moore's

Federal Practice, § 26.49 (Matthew Bender 3d ed. 2002).  To be entitled to the privilege, a

corporate lawyer must not only be functioning as a lawyer, but the advice given must be

predominately legal, as opposed to business, in nature.  *Id.*  Those lines, however, may be

difficult to draw.  *See Am. Nat'l Bank & Trust Co.*, 406 F.3d 867, 879 (7th Cir. 2005).

Additionally, the proponent must show that each individual who participated in the

communication is "sufficiently identified with the corporation."  *Harper & Row Publishers, Inc.*

*v. Decker*, 423 F.2d 487, 491-92 (7th Cir.1970), *aff'd*, 400 U.S. 348 (1971).  *See also Muro v.*

*Target Corp.*, 243 F.R.D. 301, 305-06 (N.D. Ill. 2007).

        The mere assertion of the attorney-client privilege is not enough.  Rule 26(b)(5) requires

that the withholding party make the claim of privilege expressly and "describe the nature of the

documents, communications, or things not produced or disclosed in a manner that, without

revealing information itself privileged or protected, will enable other parties to assess the

applicability of the privilege or protection."  Fed. R. Civ. P. 26(b)(5).

        Plaintiffs' primary contention with respect to documents provided to the OFCCP is that

"[w]hen information is transmitted to an attorney with the intent that the information will be

transmitted to a third party . . . such information is not confidential."  *Lawless*, 709 F.2d at 487.

However, it is impossible to tell what documents, aside from the required EEO-1 documents,

may or may not have been provided to the OFCCP or transmitted to counsel with the intent that

they be provided to the OFCCP.  Defendant's privilege log does not detail each document it may

possess that is responsive to Plaintiffs' requests but withheld on the basis of privilege.  Rather,

Defendant has simply listed a broad category of documents withheld entitled, "Adverse impact

analyses compiled at the request of counsel related to hiring (applicant flow), promotions, terminations, and compensation." (Dkt. # 164 Ex. 6).

Notably, Plaintiffs made a request pursuant to the Freedom of Information Act to the OFCCP for all OFCCP studies, reports, and investigation results of Defendant, all affirmative action plans, and all reports submitted by Defendant concerning its employment practices. (Dkt. # 164 Ex. 43).  Some documents were released, while others were withheld on the basis of various privilege/confidentiality claims, including confidential commercial or financial information and personnel information, and records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy.  The protective order already in place (Dkt. 65) provides sufficient protection for documents that may fall under these three categories.  The other category appears to relate to internal OFCCP documents (inter/intra agency documents that contain government deliberative information), which are likely not in the possession of Defendant.

Therefore, any documents provided by Defendant to the OFCCP, a third-party, cannot be withheld on the basis of privilege, with the exception of those documents provided that are subject to ongoing compliance evaluations pursuant to Exemption 7A, 5 U.S.C. § 522(b).  To the extent it has not already done so, Defendant shall produce all records provided to the OFCCP for the purpose of audits and investigations of Defendant from 2002 to the present that involved issues of racial patterns in promotion and distribution of employees through job progressions, company units and selection processes for transfers, ratings, raises and promotions.

Plaintiffs also seek all affirmative action analyses from 2002 to the present that Defendant has conducted, either internally or pursuant to 41 C.F.R. § 60-2.17(b).  As stated

24

above, Defendant claims all such analyses were conducted as part of a privileged and confidential analysis done at the request of counsel.  The only evidence to support Defendant's claim is the deposition testimony of a member of Defendant's EEO/Affirmative Action group. He repeated the exact same phrase multiple times throughout the deposition in response to questions regarding several different types of general analyses.

"[T]he burden is on the party opposing discovery to show that the attorney-client privilege applies, and mere conclusory statements will not suffice to meet that burden." *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 140 (N.D. Ill. 1993).  Mr. Hervey's conclusory statements are insufficient by themselves to satisfy the Court that the analyses at issue are protected by the attorney-client privilege.  Furthermore, his responses appear rehearsed and lawyer-driven.  Indeed, he repeatedly gave the exact same response that analyses were conducted "as part of a privileged and confidential analysis that is done at the request of counsel."  (Ex. Z).  This statement is akin to simply stamping a document "privileged" or "confidential."  Moreover, considering Defendant's general entry on its privilege log, it would be nearly impossible for Defendant to meet its burden with respect to unnamed, unidentified documents.

It is similarly impossible for the Court to find that Defendant has met its burden.  As noted, the Court's inquiry into whether privilege attaches  "must be made and sustained on a document-by-document basis. "  *Int'l Profit Assoc.*, 206 F.R.D. at 218.  It follows, then, that  a claim of privilege must also be as specific, and certainly more detailed than the blanket claim that Defendant has made.  Defendant claims that it would be unduly burdensome to list each and every analysis and associated data on its privilege log.  It also argues that it informed Plaintiffs

25

of this in a letter, as well as its intent to simply list a general category of documents, and Plaintiffs did not raise any objection.[9]  Neither the letter nor the filings with the Court provide any detail as to the number of documents at issue, whether legitimate sub-categories could be delineated (defense counsel offered to explore this notion), and the time it would take to prepare a more detailed log.  Thus, the Court has no real evidentiary basis on which to determine that in fact a burden does exist.

Although it does not appear Plaintiffs responded to Defendant's burden claim and Defendant's expressed intent to list only one general category of analyses on its privilege log, given this motion and Plaintiffs' arguments, it is clear they do object.  Plaintiffs urge the Court to find that Defendant has waived the attorney-client privilege due to its failure to identify specific documents on its privilege log.

Finding a waiver of the attorney-client privilege is a serious sanction.  *Cunningham v. SmithKline Beecham*, ___ F.R.D. ___, No. 2:07-CV-174, 2009 U.S. Dist. LEXIS 7833, at *20-21 (N.D. Ind. 2009).  A "blanket waiver is not a favored remedy for technical inadequacies in a privilege log."  *Muro v. Target Corp.*, 250 F.R.D. 350, 360 (N.D. Ill. 2007) (Citing *American National Bank & Trust Co. of Chicago v. Equitable Life Assurance Society of the United States*, 406 F.3d 867, 879 (7th Cir. 2005) for "holding that Magistrate Judge abused his discretion by finding that defects in privilege log merited a sanction of blanket waiver, absent a finding of bad faith.").

---

[9]Counsel are cautioned that future attempts to avoid compliance with Rule 26(b)(5)'s requirements, by announcing an intent to do so, then seeing if it draws on objection, may well result in a waiver of the attorney-client privilege.

"The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998).  Although Defendant's privilege log is inadequate, and it has not met its burden of proving the documents are indeed protected by the attorney-client privilege, the Court is mindful of the cautionary tone of relevant authority.  The Court will not find the privilege has been waived at this time.  Rather, the Court will allow Defendant to produce a revised privilege log and other evidence, if it so chooses, to see whether it can sustain its burden of proving the documents are protected by the attorney-client privilege.  Such supplemental information shall first be provided to Plaintiffs.  Plaintiffs' motion to find the privilege waived is **DENIED** at this time.

In summary, the Court finds that the Plaintiffs' requests for OFCCP and EEOC documents are relevant to the instant litigation and Defendant's relevancy objection is overruled.  The Court sustains Defendant's objection to providing "feeder data" consistent with its earlier order denying company-wide discovery.  The Court orders Defendant to produce documents provided to the OFCCP, to the extent it has not already done so, with the exception of those documents provided that are subject to ongoing compliance evaluations pursuant to Exemption 7A, 5 U.S.C. § 522(b).  Finally, the Court orders Defendant to supplement its privilege log to comply with Rule 26(b)(5) and relevant case law by March 23, 2009.

**<u>Motion to Compel Discovery Into Defendant's Reallocation and Buyout Process</u>**

With this motion, Plaintiffs seek (1) documents that detail Defendant's criteria and processes for buyouts and the data on the name, race, geographic location, job function, and pay level of all Defendant employees offered severance agreements since July 1, 2005; and (2) data

that identifies each of Defendant's employees that has been reallocated from April 20, 1997, to present.

Defendant states it has already given copies of its reallocation and severance policies to Plaintiffs, has responded to specific requests for information related to severance offers made to particular employees, has offered to provide more information about specific employees if so requested, and has been deposed about its reallocation process.  Defendant thus contends it has already provided the documents that detail its criteria and processes for buyouts.  It objects to providing what it considers to be company-wide discovery on all employees who were offered severance agreements since July 1, 2005, and all employees that have been reallocated since 1997.

With respect to Plaintiffs request for "documents that detail its criteria and processes for buyouts," the Court is unclear as to what more Plaintiffs seek beyond what Defendant has provided.  Plaintiffs respond to Defendant's claim that it has produced said documents by claiming that the documents "did not explain how employees are targeted for reallocations, and in particular the criteria Defendant relies upon when selecting employees." (Dkt. #214 pg. 6). Plaintiffs then refer to Exhibit 56 as illustrative of why Defendant's production does not answer Plaintiffs' questions.

It is Plaintiffs' burden to show the Court how Lilly's production is deficient.  Simple reference to an exhibit (apparently expecting the Court to cull the information contained therein and determine why it is unsatisfactory to Plaintiffs) wholly misses the mark.  Further, Plaintiffs have taken Rule 30(b)(6) depositions on this topic, and certainly could have sought an answer regarding  the data they claim is missing from the documents produced, i.e., the particular

28

criteria Defendant relies upon when selecting employees.  If a document exists that answers this question, Defendant must provide it.  Otherwise, the Court is unable to determine what other documents regarding criteria for buyouts and reallocations Defendant has failed to provide.

Remaining then are Plaintiffs' requests for data regarding all employees offered severance agreements since July 1, 2005, and data that identifies each Lilly employee that has been reallocated from April 20, 1997, to present.  Defendant objects to providing such information on the basis that it is company-wide discovery that has heretofore been prohibited by the Court.  Further, Defendant cites confidentiality and privacy concerns in disclosing names of employees.  Defendant also claims that the burden of producing this information is "self-evident."  (Dkt. # 188 pg. 12).

Plaintiffs have alleged in their Second Amended Complaint that Defendant's reallocation process has a disparate impact against African-Americans.  (Dkt. # 131 ¶ 133).  Several individual Plaintiffs have alleged discrimination in the reallocation process.  (Dkt. 131, Appx. A ¶¶ 52, 104).  Thus, the reallocation process is clearly relevant to Plaintiffs' claims.  It does not appear Defendant disputes the relevance of either the reallocation or buyout/severance agreements.

As Plaintiffs point out, while their requests do seek information company-wide, the scope of the requests is more limited than their request for personnel data on all of Defendant's employees.  Here, they seek data for only those employees who have been offered severance agreements or been reallocated, not Defendant's entire workforce.  While the burden of producing discovery of personnel information for the entire 21,000 person workforce of Defendant is self-evident, the burden of providing information regarding reallocated employees

and employees offered severance agreements is not.  The Court has no way of knowing how many employees fall into either category, and has no reason to assume it to be the entire workforce of Defendant.

There is also some question as to the temporal scope of Plaintiffs' request with respect to reallocated employees.  Plaintiffs specifically ask for discovery from April 20, 1997, to present, yet only ask for discovery as to severance agreements from July 1, 2005, to present.  Defendant notes that Plaintiffs' discovery requests only sought information back to 2005, and that "[i]t is not clear whether the date in the brief is an attempt to expand the interrogatory's scope or whether it is an error, as the brief itself is inconsistent regarding the date."  (Dkt. # 188 pg. 2 fn 1).  Plaintiffs failed to address this in their reply.  The Court is similarly confused by Plaintiffs' specific request for data from April 20, 1997, on the one hand, but from July 1, 2005, on the other.  Indeed, Plaintiffs state in their reply that their motion seeks "data and documents relating to Defendant's criteria and processes for reallocations and buyouts from July 2005 to present." (Dkt. # 214 pg. 1).

Certainly, the request for eleven years worth of data is overbroad, particularly when the Court is given no evidence as to the basis for selection of the April 20, 1997 date.  Therefore, the same temporal scope for both requests will apply, from July 1, 2005, to present.  In addition, Plaintiffs do not specify precisely what data they seek to identify employees that have been reallocated.  The Court can only assume they seek the same identifying data as that requested for the severance agreements.  That is all the Court will order Defendant to produce.

With respect to Defendant's confidentiality/privacy concerns in providing the names of employees, the Court finds that concern to be legitimate.  Further, the name of the employee is not necessary to conduct the analyses Plaintiffs desire.

Therefore, Plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART.**  The motion is granted in that the Court orders Defendant to produce data on the race, geographic location, job function, and pay level of all Defendant employees offered severance agreements since July 1, 2005; and (2) data on the race, geographic location, job function, and pay for each Defendant employee that has been reallocated from July 1, 2005, to present.  The names of the employees shall be redacted, and in that sense the motion is denied.

With respect to documents that detail Defendant's criteria and processes for buyouts, that request is also **GRANTED IN PART AND DENIED IN PART**.  If a document exists that heretofore has not been produced and provides the particular criteria Defendant relies upon when selecting employees for buyouts or reallocations, Defendant should provide it.  Otherwise, the Court is unable to determine what other documents regarding criteria for buyouts and reallocations Defendant has failed to provide.

**<u>Conclusion</u>**

For the foregoing reasons, Plaintiffs' Second Motion to Compel Discovery (Dkt. # 163) is **DENIED**.  Defendant's Motion to Strike Dr. Lance Seberhagen's Untimely Expert Opinions and Report (Dkt. # 245) is **GRANTED**.

Plaintiffs' Motion to Compel Documents Improperly Withheld on the Basis of Privilege (Dkt. # 166) is **GRANTED IN PART AND DENIED IN PART**.  Defendant's relevancy

objection is overruled.  The motion is **DENIED** with respect to "feeder data" consistent with the Court's earlier order denying company-wide discovery.  The motion is **GRANTED** with respect to documents produced to the OFCCP, if any have yet to be provided, with the exception of those documents provided that are subject to ongoing compliance evaluations pursuant to Exemption 7A, 5 U.S.C. § 522(b).  With respect to the remaining withheld documents, Defendant is **ORDERED** to produce a revised privilege log, to comply with Federal Rule of Civil Procedure 26(b)(5) and relevant case law.  **This shall be produced no later than March 23, 2009.**  The parties shall then meet and confer to attempt to resolve the privilege issue, given the guidance provided by the Court's entry on the matter, **no later than April 1, 2009**.

An in-person status conference will then be conducted on **April 9, 2009, at 2:00 p.m.** The parties should be prepared to discuss the remaining issues regarding the allegedly privileged documents, including the total number of documents as well as the total number of pages of each document.

Plaintiffs' Motion to Compel Discovery Into Defendant's Reallocation and Buyout Processes (Dkt. # 170) is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted in that the Court orders Defendant to produce data on the race, geographic location, job function, and pay level of all Defendant employees offered severance agreements since July 1, 2005; and (2) data on the race, geographic location, job function, and pay for each Defendant employee that has been reallocated from July 1, 2005 to present.  **This shall be produced no later than March 23 2009.**  The names of the employees shall be redacted, and to that extent the motion is denied.

With respect to documents that detail Defendant's criteria and processes for buyouts, that request is also **GRANTED IN PART AND DENIED IN PART**. If a document exists that provides the particular criteria Defendant relies upon when selecting employees for buyouts or reallocations that has not already been provided, Defendant should provide it, **no later than March 23, 2009**.

The Court will also establish additional deadlines at the April 9, 2009 conference to prepare the case for class certification briefing.

**SO ORDERED.**

03/16/2009

Jane Magnus-Stinson
United States Magistrate Judge
Southern District of Indiana

Distribution:

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com

Robert Thomas Dassow
HOVDE DASSOW & DEETS LLC
rdassow@hovdelaw.com

Christine  Dunn
SANFORD WITTELS & HEISLER, LLP
cdunn@nydclaw.com

Krissy A. Katzenstein
BAKER & DANIELS LLP
krissy.katzenstein@bakerd.com

Martha M. McBrayer

MORELLI RATNER, PC
mmcbrayer@morellilaw.com

Benedict P. Morelli
MORELLI RATNER, PC
bmorelli@morellilaw.com

D. Lucetta Pope
BAKER & DANIELS-SOUTH BEND
lucetta.pope@bakerd.com

David S. Ratner
MORELLI RATNER, PC
dratner@morellilaw.com

David L. Rose
ROSE & ROSE PC

33

daver@roselawyers.com

Joshua N. Rose
ROSE & ROSE PC
josh@roselawyers.com

Yuval  Rubinstein
ROSE & ROSE P.C.
yrubinstein@roselawyers.com

David Weissbord Sanford
SANFORD WITTELS & HEISLER LLP
dsanford@nydclaw.com

Robert K. Stanley
BAKER & DANIELS
rkstanle@bakerd.com

George A. Stohner
MORGAN LEWIS & BOCKIUS
gstohner@morganlewis.com